**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS CARE PTY LIMITED, *et al.*,[1] | ) | Case No. 23-90614 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF DAVID YOUNG,
### CHIEF EXECUTIVE OFFICER OF GENESIS CARE PTY LIMITED, IN SUPPORT OF
### THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Young, hereby declare under penalty of perjury:

1.     I am the Chief Executive Officer at Genesis Care Pty Limited[2] ("TopCo") and I have served in that position since April 17, 2023.  I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

\*     \*     \*     \*     \*

2.     GenesisCare is a global healthcare company and a leading cancer care provider that provides life-changing treatment and support to its patients.  GenesisCare is one of the world's largest integrated oncology organizations and the world's largest provider of radiotherapy—a vital treatment option for cancer patients.  Patients are provided with access to diagnostics, medical oncology, surgical oncology, radiotherapy, and cutting-edge therapies, and the ability to participate

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GenesisCare.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 2270 Colonial Blvd., Fort Myers, FL 33907.

[2]     Genesis Care Pty Limited, a proprietary limited company organized under the laws of Australia, is the parent company of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with Genesis Care Pty Limited's direct and indirect non-Debtor subsidiaries, the "Company" or "GenesisCare").

in some of the latest clinical trials.  Headquartered in Sydney, Australia, GenesisCare provides a network of over 5,500 highly-skilled healthcare professionals and support staff to patients globally.

3.     At its inception, the vision for GenesisCare was to build a global network of cancer care centers that provide world class patient care and a robust contract research organization and to create partnerships that provide a global patient base to support cutting-edge clinical trials.  The Company's unwavering commitment to a "patient first," personalized care experience has been the driving force behind its business decisions.

4.     Currently, the Company offers services in Australia, Spain, the United Kingdom, and the United States.



5.     ***Australia.***  The Company operates a network of 40 oncology centers in Australia, all of which provide radiation oncology services, 7 of which provide medical oncology services, and 4 of which provide theranostics services.  Across its Australian centers, GenesisCare's over 140 Australia-based physicians and 1,700 clinical staff treat over 30,000 patients annually, making GenesisCare the largest oncology provider in Australia.  The Company plans to drive growth to its Australia business through (i) further integrating its cancer care model with a strong focus on

medical oncology, a market with significant demand, (ii) adding multiple new sites to its network, creating growth opportunities across metro and regional centers, and (iii) continued partnership with relevant government entities and other industry players.

6.    ***The United Kingdom.***  GenesisCare entered the United Kingdom market—where the Company operates 14 radiation oncology centers, 6 of which provide medical oncology services and 6 of which offer diagnostic imaging—in 2015 with the acquisition of Cancer Partners U.K.  In the United Kingdom, GenesisCare employs over 320 physicians and 400 clinical staff in the who treat over 3,000 patients annually.  GenesisCare is the United Kingdom's leading private LINAC operator in a market where there is a growing need for private operators and little to no private competitors.  The Company plans to continue (i) focusing on new site development and service expansion including offering MR-LINAC[3] services and (ii) developing additional growth of integrated cancer services and related outsourcing opportunities.

7.    ***Spain.***  GenesisCare expanded into the Spanish market through its acquisitions of Oncosur and IMOncology in 2016.  GenesisCare is the second-largest provider of radiotherapy in an otherwise fragmented market in Spain, operating at 21 centers that employee more than 60 physicians and 270 clinical staff who treat over 7,600 patients per year.  Plans for growth of the Spanish business include (i) investing in state-of-the-art equipment, including the first private MR-LINAC in Spain, (ii) developing a strong pipeline of standalone sites and partnerships with hospitals networks, and (iii) expanding clinical trials and research.

---

[3]    Magnetic Resonance Imaging Guided Linear Accelerator is a LINAC machine that uses both magnetic resonance imaging ("MRI") and radiotherapy to treat certain cancers throughout the body.  The radiation delivery on the MRI-LINAC is fully integrated with the MRI, allowing the physician to see the internal anatomy, giving physicians greater control over the delivery of radiation.

8.      In 2020, the Company took the leap into the United States market through the purchase of 21st Century Oncology ("21C"), a company comprised of a large network of small, local, physician-led cancer treatment centers that provided personalized care to cancer patients, including in communities where access to advanced cancer treatment may have otherwise been limited or unavailable.

9.      While the Company has successfully maintained high-quality patient care and a culture of empathy, the integration of 21C into the global GenesisCare business came with operational challenges.   Specifically, the United States arm of the GenesisCare business ("GC US") has faced challenges related to (i) declining revenue cycle management performance that has resulted in lower net collection rates, (ii) antiquated IT and data collection systems that has led to operational inefficiencies, (iii) aged equipment that requires significant capital to replace, (iv) anticipated synergies between the GC US and rest of world businesses failing to materialize and resulting in increased corporate costs, and (v) a slowed demand for services, as well as labor and supply shortages, resulting from the COVID-19 pandemic.   The foregoing, coupled with the Company's failed attempts to obtain the capital necessary to make investments in the GC US business, has resulted in GC US experiencing declining revenue, higher costs for outsourced services, growing impairment losses, and, ultimately, unprofitability as of last year. Due to the financial state of GC US, the Company's operations in the United Kingdom, Australia, and Spain ("RoW"), which operate at a profit, have been funding GC US's continued operations. This has strained RoW's liquidity, leading to RoW taking steps to conserve cash, including delaying payment to its trade partners, which I believe will harm the Company's relationships with key vendors and suppliers if it continues.

10.     Despite GC US's strategic and operational challenges, the Company sees a path to profitability for GC US and believes it is poised for an operational turnaround.  A new, capable management team has assessed areas for potential improvement and developed a detailed turnaround plan to increase revenues and reduce costs for GC US.

11.     But the path to a GC US turnaround will take time and capital, and the GenesisCare enterprise currently does not have the wherewithal to make such investments.  Accordingly, the Company determined that it is in the best interest of the Company and its stakeholders to commence a sale of the GC US business to one or more buyers able to implement its long-term strategy.   Through these chapter 11 cases, the Company will commence a comprehensive marketing process of its GC US business to potentially identify a strategic partner and maximize value for the Company and its stakeholders.

12.     Taken together, GenesisCare's investment in unprofitable global initiatives, GC US's operational challenges, industry and regulatory headwinds, and the lingering impacts of COVID-19 have significantly strained the global business's liquidity.  In addition to the GC US business challenges, the Company invested in many global initiatives which have resulted in increased corporate overhead costs without a clear path forward for these projects to deliver a positive cashflow and profit.  In recent months, the Company's liquidity has reached low levels— most recently as a result of certain of its prepetition lenders refusal to fund approximately AUD $76 million the Company was entitled to draw under its Revolving Credit Facilities (as defined herein).  In light of such lenders' failure to fund, the Company had to consider remaining alternatives to obtain alternative sources of liquidity, including engaging with its stakeholders and third parties and preparing to commence these chapter 11 cases.  Ultimately, the Company was unable to obtain out-of-court financing, and the Company now seeks access to a

debtor-in-possession financing to (a) continue to operate its business in the near term, (b) rescue the global cost base of the company, (c) run a sale process for the GC US business, and (d) maximize the value of the Company.

13.     To assist in exploring alternatives to meet its liquidity needs and, ultimately, preparing for these chapter 11 cases, the Company retained Kirkland & Ellis LLP ("K&E") as counsel, PJT Partners ("PJT") as investment banker, and Alvarez & Marsal North America, LLC ("A&M" and, together with K&E and PJT, the "Advisors") as restructuring advisor in February 2023.

14.     The Advisors worked with the Company to evaluate alternatives and determine the best path ahead.  As mentioned, in April 2023, the Company initiated a draw down on its Revolving Credit Facilities under the Company's Senior Facilities Agreement (each as defined herein) to fund operations while the Company continued to assess strategic alternatives and engage with stakeholders regarding the same.  At this time, the Company had AUD $120.5 million in capacity under the Revolving Credit Facilities—sufficient liquidity to fund operations through at least August 2023.  The draw-down requests were funded by nine institutions on a timely basis, but were unfunded by the remaining four of the banks (the "Defaulting Banks") who held a majority of commitments under the Revolving Credit Facilities without justification, other than requests for voluminous diligence that were not required to be provided under the Senior Facilities Agreement. As a result, the Company received only approximately AUD $44 million—rapidly accelerating the timeline to obtain further financing to fund the Company's capital-intensive operations and sale process and practically limiting the Company's alternatives.

15.     Forced to quickly pivot, the Company and its advisors spent the last several weeks engaging with the Company's existing lenders, including an Ad Hoc Term Lender Group of

lenders under the Senior Facilities Agreement represented by Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey Capital, Inc. (the "Ad Hoc Term Lender Group") regarding various potential financing transactions in an effort to raise additional liquidity.  It became clear, however, that no out-of-court transactions would yield the needed cash infusion quickly and without implementation risk.  To maximize their ability to obtain a financing, the Debtors and their Advisors removed restrictions on trading under the Senior Facility Agreement, provided management presentations and hosted multiple all-lender meetings.  As a result, the Company and the Ad Hoc Group determined that the only practical course of action was to commence these chapter 11 cases on an emergency basis to obtain access to critical debtor-in-possession financing to allow the Company to continue operations.

16.     With the protections afforded by the chapter 11 process, the Ad Hoc Term Lender Group agreed to provide debtor-in-possession financing to the Debtors.  Specifically, and as described in greater detail in the Singh Declaration and the Fox Declaration (as defined herein), an ad hoc group of lenders under the Senior Facilities Agreement (such members, the "Backstop Parties") which have agreed to backstop the DIP Commitments (as defined in the DIP Motion[4]) and a subset of Consenting Lenders (as defined in the DIP Motion) under the Senior Facilities Agreement to be determined following a syndication process to be conducted after the Petition Date will provide an $800 million super-priority, multiple draw debtor-in-possession term loan credit facility (the "DIP Facility"), consisting of $200 million of new money loans, of which $90 million will be available upon entry of an interim order approving entry into the DIP Facility.

---

[4]     *See Debtors'* <u>*Emergency*</u> *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed substantially contemporaneously herewith (the "DIP Motion").

Among other things, the DIP Facility will be used to stabilize the Debtors' operations, fund payments to certain of the Company's critical vendors (including non-US vendors), allow the Debtors to run a marketing process and evaluate other strategic alternative for GC US, and allow the Debtors to administer these chapter 11 cases.

17.     The term sheet documenting the DIP Facility (the "DIP Term Sheet") also contains certain milestones with respect to the GC US sale process and the plan process for RoW. Specifically, the milestones include: [5]

**Plan Milestones**

- Petition Date + 2 business days: Entry of Interim Order that is acceptable to the DIP Agents and the Requisite Lenders and reasonably acceptable to the Debtors;

- Petition Date + 35 days: entry of Final Order that is acceptable to the DIP Agents and the Requisite Lenders and the Debtors;

- Petition Date + 60 days: entry by Bankruptcy Court of an order approving the Disclosure Statement that is reasonably acceptable to the Requisite Lenders and the Debtors;

- Petition Date + 75 days: filing of a plan of reorganization that provides for the payment in full of all DIP obligations and is otherwise reasonably acceptable to the Requisite Lenders and the Debtors (an "Acceptable Plan") and disclosure statement with respect to an Acceptable Plan (the "Disclosure Statement") with the Bankruptcy Court;

- Plan Filing Date + 130 days: entry by Bankruptcy Court of an order confirming an Acceptable Plan that is reasonably acceptable to the Requisite Lenders and the Debtors; and

- Plan Filing Date + 150 days: consummation of the Acceptable Plan.

**US GC Sale Milestones**

- Petition Date + 40 days: delivery of a winddown plan for US GC;

- Petition Date + 45 days: entry of an order approving bidding procedures in respect of US GC;

- Petition Date +110 days: bid deadline for US GC;

---

[5]     Any capitalized terms that is used, but not defined, in this section shall have the meaning ascribed to it in the DIP Term Sheet.

- Petition Date + 115 days: commencement of an auction (if necessary);
- Petition Date + 125 days: entry of an order approving the sale of US GC; and
- Petition Date + 145 days: consummation of the sale of US GC.

18.     Armed with substantial additional capital provided by the DIP Facility, the Debtors have commenced these chapter 11 cases to stabilize their operations and consummate a value-maximizing sale of GC US.  In parallel with the GC US sale process, the Company will focus its efforts on stabilizing the RoW business operations by, among other things, reengaging with certain existing lenders to secure sufficient capital to continue to grow the RoW business. The Debtors also intend to use the breathing spell provided by chapter 11 and the liquidity from the DIP Facility to finalize plans to foster growth and stabilize the RoW business and exit these chapter 11 cases with a right-sized balance sheet and a rationalized global footprint.

*       *       *       *       *

19.     Prior to joining GenesisCare, I held numerous senior executive positions in international healthcare services businesses.  From June 2018 to April 2023, I was President and Chief Executive Officer of PE GI Solutions, a company which provides investment and management services to physicians.  At PE GI Solutions, I was responsible for strategic direction and service development in addition to overseeing its day-to-day operations.  Prior to joining PE GI Solutions, from June 2015 to June 2018, I was the Chief Operating Officer of Privia Health, Inc., a national physician enablement company, where I helped build the group to more than 2,000 providers and was responsible for its day-to-day operations.  I have also served as the Chief Financial Officer and Interim President of Smile Brands, Inc. from June 2012 to June 2015. Prior to my position at Smile Brands, Inc., I served as the Chief Financial Officer of US Oncology, Inc. but also held various roles from June 2012 to June 2015, where I helped launch and grow its pharmaceutical services division.  I hold an M.B.A. and B.S. in Accounting from the University

of Strathclyde in Glasgow, and I am a Chartered Financial Analyst, and Certified Public Accountant, and Chartered Accountant.

20.     I submit this declaration to provide an overview of the Debtors' business, and in support of (a) the commencement of these chapter 11 cases and (b) the First Day Motions (as defined herein) filed by the Debtors.  In addition, **Exhibit A** is an illustrative structure chart that provides an overview of the Debtors' corporate organization.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To minimize disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their business, the Debtors also filed motions seeking certain "first day" relief (the "First Day Motions").

21.     Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, my conversations with the Debtors' counsel or other advisors, information supplied to me by other members of the Debtors' management and advisors, or my opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my conversations with the Debtors' counsel or other advisors, I have relied upon these employees or advisors accurately recording, preparing, or collecting such documentation and other information.  I am over the age of 18, and if called upon to testify, I would testify competently to the facts set forth in this declaration.

22.    To familiarize the Court with the Company, its business, the circumstances leading to these chapter 11 cases, and the relief the Company is seeking in the First Day Motions, I have organized this declaration as follows:

- **Part I:**  GenesisCare's corporate history and operations;

- **Part II:**  GenesisCare's prepetition corporate and capital structure;

- **Part III:**  Circumstances leading to the filing of these chapter 11 cases and an overview of the proposed restructuring;

- **Part IV:**  Restructuring negotiations and the proposed DIP Facility; and

- **Part V:**  Summary of relief requested in the First Day Motions.

<div align="center">*        *        *        *        *</div>

## I.    GenesisCare's History and Operations

### A.    Corporate History

23.    GenesisCare's current globe-spanning business traces its roots to a single cardiology clinic started in 2005.  After supporting his father through terminal illness, Dan Collins, founder of GenesisCare, had a vision to transform the state of healthcare by delivering care to patients in a more personal way.  In 2003, Dan approached Dr. Geoff Holt, who at the time led HeartCare Partners, a practice of seven well-regarded cardiologists in Brisbane, Australia. HeartCare Partners was a leader in cardiology, with standout group practice, strategic sub-specialization and expertise among its physicians, and was at the forefront of the transition to electronic medical records.  Together, Dan, Geoff, and the cardiologists of HeartCare Partners brought in critical investors, including cornerstone investor DCA Partners, to launch the GenesisCare business.  The footprint of GenesisCare started as two separate networks to provide cardiovascular care and cancer care, HeartCare network and CancerCare network, respectively. The two networks were combined in 2005 to create GenesisCare.

24.     In 2012, funds and accounts managed by Kohlberg Kravis Roberts & Co. L.P. ("KKR") purchased an approximately 45% interest in GenesisCare, which was later sold to China Resources Capital ("CR") and Macquarie Capital in 2016.  In October 2018, separate funds and accounts managed by KKR invested in GenesisCare and currently hold an approximate 30% interest in the Company.  CR, the Company's other primary equity sponsor, currently holds an approximate 35% interest in the Company.  Certain of the Company's doctors and management hold the remaining interest in the Company.

25.     Between 2015 and 2020, GenesisCare significantly expanded its operations through a series of acquisitions in the United Kingdom, Spain, and the United States.  In 2022, GenesisCare sold its cardiology business to focus its operations on oncology and other cancer care.

## B.     GenesisCare's Business and Operations

26.     GenesisCare operates over 440 centers across the Australia, Spain, the United Kingdom, and the United States and consists of a network of over 5,500 healthcare professionals and support staff.  There are 36 radiation therapy centers in Australia, 21 in Spain, 14 in the United Kingdom, and 130 in the United States.  Though GenesisCare's core practice is providing cancer care, 170 integrated medical offices in the United States offer urology, pulmonology, and other specialized care.  Every year, the GenesisCare team sees more than 450,000 patients globally.

27.     The Company employs a range of medical professionals, including radiation oncologists, medical oncologists, breast surgeons, colorectal surgeons, urologists, pulmonary oncologists, and other medical professionals, who provide high-end, specialized care to patients.

## C.     The Company-Owned and Services Agreement Business Models

28.     Specifically with respect to GC US, as set forth in greater detail in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations and (B) Obtain New Professional Corporation*

*Contracts, and (II) Granting Related Relief*, in light of the varied state regulatory landscape for health care services, GC US is often unable to directly employ physicians and other medical professionals or own healthcare practices in certain states in which they operate. As a result, the Company has developed two distinct business models. In the first model, the Company owns treatment facilities and directly employs and contracts with the medical professionals working therein—of the 470 physicians through which the Company delivers care in the United States, 280 are directly employed. In the second model, the Company contracts with private physician groups and provides a variety of administrative, financial, and management services to such physician groups pursuant to management services agreements.

### 1.    Company-Owned Business Model

29.    In jurisdictions that allow for the corporate practice of medicine (*i.e.*, an entity without a medical license owning a medical practice), the Company offers medical services directly to patients by employing physicians at clinics or treatment facilities owned entirely by the Company or jointly with other entities. This business model allows the Company to attract and retain the top physicians in their field and maintain management oversight over the clinics and treatment facilities. The physicians treat patients and retain full control over the clinical aspects in accordance with local regulations. The majority of revenue generated from this business model is derived from commercial payers, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, and private pay sources, with the remaining reimbursement derived from Medicare and Medicaid.

### 2.    The Services Agreement Business Model

30.    In jurisdictions that prohibit the corporate practice of medicine, medical services must be provided at physician-owned clinics. In these states, the Company contracts with physician-owned facilities to provide certain administrative and financial services, including the

provision of non-physician clinical and administrative staff, operations management, purchasing assistance, managed care contract negotiation assistance, reimbursement, billing, and collections assistance, information technology, human resource and payroll services, and compliance, accounting, and treasury functions. The physicians treat patients and retain full control over the business's clinical aspects in compliance with the terms of the applicable services agreements and applicable local law.

31.     In some instances, the Company also leases the facilities where oncology treatment centers are located and provides funding for certain of the medical equipment located in and other needs of such centers. In consideration for the services it provides, the Company is reimbursed by the physician groups for certain operating expenses related to the applicable treatment center and earn a monthly management fee from each physician group, calculated by the terms set forth in each services agreement.

### D.    Services Overview

32.     GenesisCare offers full-service care for its patients, including a broad range of cancer treatment options, as well as advice about managing symptoms and side effects, living well, nutrition and exercise, and practical advice about local patient groups or financial issues. Globally, GenesisCare's services include:

33.     ***Radiation therapy***.  Radiation therapy is a widely used and effective treatment option for many types of cancer. Under the Company's carefully controlled processes, targeted radiation destroys cancer cells to prevent further growth. Radiation therapy can be used alone or in combination with other treatments, such as surgery or chemotherapy. GenesisCare offers a variety of radiation therapy treatments, including:  (i) external beam radiation therapy; (ii) intensity-modulated radiation therapy; (iii) volumetric modulated arc therapy; (iv) PET/CT imaging;  (v) image-guided  radiation  therapy;  (vi)  stereotactic  body  radiation  therapy;

(vii) stereotactic radiosurgery; (viii) surface-guided radiation therapy; (ix) high- and low-dose rate brachytherapy; (x) electronic brachytherapy; (xi) MRI-guided radiation therapy; (xii) cyberknife robotic radiation therapy; (xiii) gamma knife; (xiv) tomotheraphy; (xv) accelerated breast irradiation; (xvi) prostate specific membrane antigen; and (xvii) keloid scars.

34.    ***Urology***.    Specializing in cancer treatments, the Company's urologists have experience in managing prostate, bladder, kidney, ureteric and testicular cancers.  The Company's urologists offer state-of-the-art technology including laser surgery, minimally invasive laparoscopic surgery, da Vinci Robotic surgery, extracorporeal shock wave lithotripsy, microwave thermotherapy, cryosurgery, and with radiation oncologists, external beam radiation therapy (including the most modern IMRT, IGRT and VMAT techniques), and both high-dose-rate (HDR) and low-dose-rate (LDR) brachytherapy.  GC US is the United States' largest employer of urologists.

35.    ***Pulmonology***.  The Company's pulmonologists have vast experience in treating a wide range of diseases and disorders affecting the lungs and broader respiratory system.  The network consists of nationally renowned pulmonologists and devoted support staff.  Together, the Company offers a range of diagnostic tests and the latest treatment services for all types of lung disorders.

36.    ***Surgery***.  Surgery is a crucial part of the cancer treatment journey.  The Company's surgical oncologists specialize in a variety of surgical techniques and treatment options to safely remove tumors from even the most complex and difficult-to-reach areas of the body.

37.    ***Medical Oncology***.  Medical oncology is a cancer treatment program utilizing drug therapy to treat cancer, including chemotherapy, hormone therapy, targeted therapy, and immunotherapy.

**II.     Debtors' Prepetition Corporate and Capital Structure.**

**A.     The Debtors' Corporate Structure.**

38.     As set forth on the structure chart attached as **Exhibit A**, TopCo has 89 wholly-owned subsidiary entities, 53 of which are Debtors in these chapter 11 cases.  TopCo and the Debtors, as applicable, are members in 28 joint venture entities.

**B.     The Debtors' Capital Structure.[6]**

39.     The Debtors have approximately $1.7 billion in total funded debt obligations.  This consists of approximately (a) $1,547 million in aggregate principal amount outstanding under the Term Loan B Facilities, (b) $81 million in aggregate principal amount outstanding under the Revolving Credit Facilities, and (c) $87 million in aggregate principal amount outstanding under two shareholder loans, as described herein:

| ($ in millions) | Principal |
|---|---|
| **Secured Debt Facilities** | |
| TLB | $1,547 |
| RCF | $81 |
| KKR Loan | $56 |
| APH Loan | $31 |
| **Total Funded Debt** | **$1,714** |

**1.     Funded Indebtedness.**

*a.     The Senior Facilities Agreement.*

40.     Genesis Care Finance Pty Ltd ("GC Finance") and certain of its subsidiaries entered into that certain senior facilities agreement dated October 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, including as amended and restated by

---

[6]     In this section, the Debtors' euro-denominated loans are converted to dollars using a conversion rate of $1.0689 USD/EUR, which represents the opening spot rate, as of May 31, 2023, as reported by Bloomberg (rounded to four decimal places) and the Debtors' Austrian dollar-denominated notes are converted to dollars using a conversion rate of $0.6503 USD/AUD, which represents the opening spot rate, as of May 31, 2023, as reported by Bloomberg (rounded to four decimal places).

each amendment and restatement agreement dated February 28, 2020, March 19, 2020, and June 1, 2020 and by an amendment letter dated October 1, 2021, the "<u>Senior Facilities Agreement</u>") among Genesis Specialist Care Finance UK Limited ("<u>GSC Specialist Finance</u>"), the additional borrowers and guarantors party thereto, the lenders from time to time party thereto (each a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"), Kroll Agency Services Limited (formerly Lucid Agency Services Limited) as facility agent, and Kroll Trustee Services Limited (formerly Lucid Trustee Services Limited) as security agent.  The Senior Facilities Agreement is comprised of two separate tranches of funded debt, each guaranteed by certain subsidiaries of the Company and secured by first-priority liens on substantially all assets of the guarantors subject to customary exclusions.

i.     ***The Revolving Credit Facilities.***

41.     The Senior Facilities Agreement provides for AUD $200 million (or USD $130 million) of revolving credit facilities, comprised of:  (i) AUD $100 million (or USD $65 million) of commitments created on October 23, 2018 ("<u>RCF1</u>"); and (ii) and additional AUD $100 million (or USD $65 million) of commitments created on March 19, 2020 ("<u>RCF2</u>" and together with RCF1, the "<u>Revolving Credit Facilities</u>").

42.     Per its terms, the applicable Debtors are permitted to draw under the Revolving Credit Facilities in Australian Dollars, New Zealand Dollars, British Pound Sterling, Euro, U.S. Dollars, Singapore Dollars, Hong Kong Dollars, or other Option Currency (as defined in the Senior Facilities Agreement).   As of the Petition Date, approximately AUD $123.9 million (or USD $81 million) in aggregate principal amount is outstanding under the Revolving Credit Facilities.

43.     As discussed herein, the Company submitted the Utilization Requests in April 2023 to access remaining liquidity of AUD $120.5 million (or USD $78 million) available to the

Company under the Revolving Credit Facilities.  The Defaulting Banks refused to fund the Utilization Requests against a requested draw of approximately AUD $76 million (or USD $49 million), necessitating the filing of these chapter 11 cases.  As a result, the Company only received approximately AUD $44 million (or USD $29 million).

<div align="center"><em>ii.</em>    <strong><em>The Term Loan B</em></strong>.</div>

44.      The Debtors also maintain a term loan facility, provided under the Senior Facilities Agreement (the "Term Loan B Facilities") that is fully drawn in the aggregate amount of USD $1,547 million (on a converted basis) as of the Petition Date.  This amount represents two separate tranches, maturing either in October 2025 or May 2027.

<div align="center"><strong><em>b.</em></strong>    <strong><em>Shareholder Loans.</em></strong></div>

<div align="center"><em>i.</em>    <strong><em>The KKR Loan</em></strong>.</div>

45.      On June 4, 2022, TopCo, as borrower, entered into that certain loan agreement (as amended, restated, supplemented, or otherwise modified from time to time, including as amended and restated by an amendment and acknowledgment letter dated August 29, 2022, the "KKR Loan Agreement," and the loan thereunder, the "KKR Loan") with Asia GCMIV Holdings II Pte. Ltd. ("Asia GCMIV"), a fund managed by KKR, as lender, providing for a first-lien secured loan in an aggregate principal amount of AUD $75 million (or USD $49 million), secured by substantially all property of TopCo (but not the other Debtors), subject to customary exclusions.  At the request of the Company, the KKR Loan was provided by Asia GCMIV to support the Company when it was facing a near-term liquidity shortfall, and the proceeds of the KKR Loan were used by GC Finance for liquidity and working capital.

46.      The KKR Loan Agreement's original maturity was June 2023.  Following two separate requests by the Company, Asia GCMIV agreed to an amendment to extend the maturity of the KKR Loan Agreement to (i) (a) July 31, 2023 or (b) if agreed by Asia GCMIV (in its

absolute discretion) following a written request by TopCo, such later date that is up to January 31, 2024 and then to (ii) (a) November 30, 2023 or (b) if agreed by Asia GCMIV (in its absolute discretion) following a written request by TopCo, such later date that is up to May 30, 2024. As of the Petition Date, approximately AUD $86 million (or USD $56 million) remains outstanding under the KKR Loan, representing the original principal and interest paid in kind.

ii.    ***The APH Loan***.

47.    On August 29, 2022, TopCo, as borrower, entered into that certain loan agreement (the "APH Loan Agreement," and the loan thereunder, the "APH Loan") with Asia Pacific Healthcare Investments Limited, as lender, providing for a loan secured by a second lien against substantially all property of TopCo (but not the other Debtors) in the amount of AUD $42.8 million (or USD $28 million). The proceeds of the APH Loan were used for payment of certain working capital needs.

48.    The APH Loan matures on either (a) July 31, 2023 or (b) if agreed by Asia GCMIV Holdings II Pte. Ltd. (in its absolute discretion) following a written request by TopCo, such later date that is up to January 31, 2024. As of the Petition Date, approximately AUD $48 million (or $31 million) remains outstanding under the APH Loan, representing the original principal and interest paid in kind.

c.    ***The Hedging Agreements***.

49.    The Company is party to hedging agreements (the "Hedging Agreements") with various counterparties (the "Hedge Counterparties") pursuant to which the Company has entered into cross-currency interest rate swaps (the "Hedges"). The purpose of the Hedges is to hedge foreign exchange and interest rate risk arising in connection with the Term Loan B Facilities by exchanging EUR funds borrowed under the Term Loan B Facilities and effectively converting the

interest payment obligations thereunder into AUD, USD, GBP to match the currency requirements in each of the regions in which the Company operates based on the Company's EBITDA mix by region. As of the Petition Date, the Company has Hedges outstanding that effectively convert a total of EUR 187.0 million into AUD 299.9 million, a total of EUR 75.0 million into GBP 64.7 million, and a total of EUR 408 million into USD 457.1 million.

50.     As a result of the Company's strained liquidity situation and to preserve critical cash in the lead-up to a chapter 11 filing, the Company did not make certain payments that were due under Hedges with Bank of America, Morgan Stanley, and Bank of China on May 25, 2023.

51.     As of the Petition Date, the Debtors are a party to Hedging Agreements with Bank of America, Morgan Stanley and Bank of China. All Hedges with HSBC were terminated prior to the Petition Date. The approximate mark-to-market value to the Company of all Hedges as of April 30, 2023 (including those with HSBC that have been terminated) was approximately negative USD 10.9 million.

### d.     The Intercreditor Agreement.

52.     Lucid Agency Services Limited, as senior facility agent, TopCo, GC Finance, the SFA Lenders, and certain other parties entered into that certain intercreditor agreement dated October 23, 2018 (as may be amended and restated, the "Intercreditor Agreement"). The Intercreditor Agreement provides that, with respect to shared collateral, the Revolving Credit Facilities and the Term Loan B Facilities rank *pari passu* and without any preference amongst them. The Intercreditor Agreement also provides that the interest rate swaps under the Hedging Agreements rank *pari passu* with the debt issued under the Term Loan B Facilities and the Revolving Credit Facilities.

### III.     Events Leading to These Chapter 11 Cases

### A.     2020 Acquisitions of 21st Century Oncology and Landmark

53.     In May of 2020, GenesisCare acquired 100% ownership of 21C to make its entry

into the United States market.  The acquisition came after 21C had emerged from its chapter 11

cases, styled *In re 21st Century Oncology Holdings, Inc.*, Case No. 1722770 (RDD) (Bankr.

S.D.N.Y. 2017), on May 25, 2017, which cases were commenced as a result of 21C's declining

patient revenue and significant litigation costs, among other liquidity constraints.  At the time of

its emergence from chapter 11 and the Company's acquisition of 21C, 21C was well-positioned

for success, having reduced its funded debt obligations by over $500 million and arranged for a

commitment of $200 million in new money notes through its chapter 11 process.

54.     Since GenesisCare's acquisition of 21C and entry into the United States market,

however, GC US has faced significant liquidity issues and operational challenges, including:

- *Decentralized and disconnected centers*:  21C ran on a network of small, disconnected cancer treatment centers which lacked centralization of data collection and standardization of IT services.  Certain GC US centers require modernization of their IT and other systems and more effective integration across locations in order for their high-quality cancer care services to be viable as a business.

- *Outdated, expensive equipment*:  Radiation oncology, which constitutes GC US's primary revenue line, requires significant capital expenditures, particularly on essential machinery.  Linear accelerators (or "LINACs") are machines commonly used to deliver external beam radiation treatments (which involve directing a high-energy x-ray beam at a patient's tumor) to cancer patients.  LINACs typically have a lifespan of ten to fifteen years.  Many of GC US's LINACs are past their usual lifespan, which causes increased "downtime," or time where the machine is not up and running and a patient therefore cannot receive treatment at the time their appointment had been scheduled, resulting in inefficiencies and decreased revenues.  Repairs during each "downtime" are costly and require payment in cash at the time of service.  Unfortunately, in light of its liquidity outlook, the Company has been unable to make necessary investments in repairing and replacing its LINACS.

- *Increased competition*: Since closing the sale of 21C to GenesisCare, certain legislative changes in Florida voided non-compete agreements between physicians and their employing entities in counties where there are no other physician practices of the same medical specialty, thus voiding non-compete agreements between 21C and GenesisCare.  Therefore, doctors that were formerly affiliated with 21C were able to

open competing centers in close proximity to GC US centers and recruited GC US's highest-billing doctors to join those newly opened practices.   This increased competition and removal of crucial physicians particularly affected the West Florida market—GC US's top market at the time.

**B.      Revenue Cycle Issues**

55.      At the heart of profitability in the healthcare services industry lies the "revenue cycle."  The revenue cycle is the process through which healthcare providers are paid, beginning with the referral process.

56.      First, a healthcare provider receives a referral for patient care, and the patient will arrive in-office and register for their appointment.   Next, the physician will draft clinical documentation related to the patient care and the center will determine the patient's insurance eligibility by verifying the patient's coverage and, in some cases, running pre-authorizations on treatment the patient will receive.   After treatment, the physician thoroughly documents the patient's treatment and converts the information into code in accordance with insurance parameters.  To receive payment, the treatment and codes must then be submitted as a claim to the payor (typically an insurance carrier)—the payment will then be posted or, alternatively, denied. If payment is denied by the payor, an appeal process typically must be followed and a secondary billing process commenced.  Finally, aged accounts receivable must be pursued or written off.



57.     Managing the revenue cycle is time-consuming, complex, and ultimately integral to the Company's ability to realize revenues in connection with its services.  In 2020, GC US outsourced most of its revenue collection function to a third-party vendor, Integra Connect.

58.     Outsourcing the Company's revenue cycle management came with unexpected challenges.  Hiring a third-party vendor has created a disjointed experience, in part because the third-party vendor has also outsourced some of its functions to vendors, causing a lack of oversight within each stage of the revenue cycle.  Coupled with other challenges, outsourcing the revenue cycle resulted in a substantial drop in GC US's "net collection rate," or the percentage of the value of services provided to patients that the Company is ultimately able to receive.  As of the Petition Date, GC US ultimately collects approximately 91% of amounts due, where the industry average is approximately 97%.

C.      **Australian Regulatory Issues**

59.      Following a Company-initiated review of certain operational processes across its Australian business, GenesisCare identified:  (i) potential issues related to patient billing under its "EasyPay" program; and (ii) billing practices with respect to concessional patients[7] treated using equipment funded by Radiation Oncology Health Program Grants ("ROHPG") inconsistent with the conditions of grant.

60.      ***EasyPay***.  In 2013, GenesisCare launched an in-house program called "EasyPay," which was a "buy now, pay later," interest-free payment facility.  EasyPay was designed to make radiation therapy treatment more affordable to patients by allowing a patient to spread the upfront cost of treatment across a series of smaller payments.  EasyPay also provided certainty to patients regarding their net out-of-pocket costs ("OPCs") in connection with their treatments by fixing those costs upfront.  GenesisCare used an internal calculation mechanism in both setting the price and loan repayments and as the basis for patients claiming government rebates.  Information received during the internal review process caused GenesisCare to believe that the mechanism that produces the calculations contains errors, which resulted in potential overcharges to the Australian government.[8]

61.      ***ROHPG.***  ROHPG is an Australian government-funded program through which eligible providers of cancer treatment can receive assistance in purchasing certain radiation therapy equipment, including buying or replacing aged LINACs, through a government grant.  Grant funding helps to cover the professional and operating costs of oncology services.  GenesisCare is

---

[7]      "Concessional patients" refers to patients that are entitled to "concessions," or discounts, on their medical costs through the Medicare system in Australia for meeting certain eligibility criteria, which include, for example, being on a government pension.

[8]      Past patients have not paid more than their respective agreed fixed OPCs.  Accordingly, this issue has not resulted in overcharges to GenesisCare's patients.  The analysis of the effect of this issue remains ongoing.

a recipient of ROHPG funding at multiple centers across its Australian business. Through its internal review, the Company identified that certain funding recipient sites may not have been offered bulk billing (which results in no cost for treatment to the patient),[9] as required under the ROHPG grant conditions, but were instead charged an out-of-pocket fee.

62.     The Company has reacted swiftly to address these problems. The Company updated its billing systems, and as of April 28, 2023, suspended its use of EasyPay and ROHPG invoicing. GenesisCare proactively notified Australian regulators, as well as its doctors and employees, and continues to engage cooperatively with all relevant parties. GenesisCare remains committed to open and cooperative communications with Australian regulators, which remain ongoing, and to supporting its physicians and employees through the process of invoice and billing changes.

63.     The Debtors and their advisors continue to work diligently to assess the potential impacts on the Company's restructuring efforts as the independent review continues.

**D.      Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic**

64.     GenesisCare entered the United States market just ahead of the global COVID-19 pandemic. The pandemic had a significantly adverse impact on the entire healthcare industry. Challenges throughout the pandemic included implementing significant precautions in the centers and spacing out appointments to limit the number of patients in the Company's facilities. Patients were more averse to exposure to the COVID-19 virus and resisted visiting facilities for in-person treatment. From the start of FY2020 to the start of FY2021, radiation oncology volumes in the

---

[9]     Bulk billing is a payment option under the Medicare system in Australia, where a healthcare services provider is paid a portion of the scheduled service fee for treatment by billing the government through the patient's Medicare card. As a result, the patient does not pay for treatment. The healthcare services provider receives only a fixed proportion of the scheduled fee that a patient would otherwise pay if the patient was privately billed, but avoids the costs and risks associated with billing and debt collection.

United States alone dropped from approximately 2,900 treatments per day to less than 2,500 treatments per day, a drop of nearly 15%. The effects have been prolonged and the volume of treatments per day have not yet returned to pre-COVID-19 levels.

65.     Additionally, the COVID-19 pandemic spurred a nationwide health care labor shortage directly affecting the healthcare services sector, as many part-time and retirement-age physicians exited the workforce. This has created significant upward pressure on clinician wages and salaries, along with the general inflationary pressure increasing the cost of equipment and other supplies necessary to run GenesisCare's treatment centers.

## IV.     Operational Initiatives

66.     Despite the challenges faced by the Company and, specifically, GC US, the Company has taken critical steps to stabilize its operations and increase revenue generation. Specifically, GC US:

A.  engaged in a series of actions to improve net revenue collection and streamline the revenue cycle, including hiring an internal Senior Vice President of Revenue Cycle Management, commencing revenue collection services back in-house, implementing a process to collect nearly $28 million of aged accounts receivable, and delegating an internal team for revenue cycle management;

B.  developed plans to replace its aging fleeting of radiation oncology equipment; and

C.  began implementing a modernization plan of its IT and data collection services, including by stabilizing and building out strategically located data centers, completing network hardware refreshes and network circuit upgrades, and modernizing center telephones.

67.     GC US has also taken measures to implement cost reductions, including:

A.  Cutting over $43 million in costs through reductions in force, reducing marketing budgets, and shrinking other overhead costs;

B.   Analyzing the profitability of staff practices and developing a plan to engage in divestitures of staff practices that are unprofitable and reduce dependence on locum tenens[10]; and

C.   Improving profitability in staff practices, including through developing a task force to improve all aspect of billable medical practices.

68.     GC US's operational initiatives will reduce costs and set the stage for long-term viability of GC US.  But the timeline to fully realize cost savings is protracted and the Company does not have the requisite capital to continue to fund and maintain the GC US business during its turnaround process.

## V.     Restructuring Actions

69.     The Company requires an immediate-term solution to mitigate its liquidity challenges, right size its capital structure, and prevent degradation of its global business.

70.     The Company and its advisors spent much of the last four months evaluating opportunities to secure additional liquidity.   PJT and K&E engaged with the Company's stakeholders to discuss various financing alternatives to inject the Company with the capital to fund operations and an operational turnaround of GC US.

71.     As the Company's liquidity position deteriorated, the Company looked to utilize the remaining AUD $120.5 million of capacity under the Revolving Credit Facilities.   On April 12, 2023, Debtors Genesis Care Finance Pty Ltd and GenesisCare USA Holdings, Inc. (the "RCF Debtors") submitted the two utilization requests to draw down on the remaining commitments.   This additional liquidity would have allowed the Company to fund operations through at least August 2023 and would have provided additional time to allow the Company to develop and analyze a more comprehensive resolution.

---

[10]   "Locum tenens" refers to when a physician temporarily works at a practice that is not his or her own, typically to fill a vacancy in an area that is not otherwise saturated with physicians available to work.

72.     Pursuant to the terms of the Senior Facilities Agreement, the lenders under the Revolving Credit Facilities (the "RCF Lenders") are legally obligated to fund drawn down requests once the RCF Debtors deliver utilization requests that confirm no Default (as defined in the Senior Facilities Agreement) is continuing or will occur as a result of the utilizations and confirm that certain Repeating Representations (as defined in the Senior Facilities Agreement) are true and accurate.   The Utilization Requests submitted on April 12, 2023, met all of the applicable requirements under the Senior Facilities Agreement.   Accordingly, each of the RCF Lenders were obligated to fund the Utilization Requests by April 18, 2023.

73.     Despite this clear obligation, on April 17, 2023, the Defaulting Banks, through their counsel, Linklaters LLP, declined to fund the Utilization Requests citing the RCF Debtors' lack of explanation or advance notice to the RCF Lenders, neither of which the RCF Debtors were obligated to do under the Senior Facilities Agreement.   In the same correspondence, the Defaulting Banks demanded that the RCF Debtors, among other things, withdraw the Utilization Requests, provide responses to extensive information requests, set up meetings with the Company's senior management team and the Defaulting Banks, provide written confirmation from the RCF Debtors' directors that they are acting in good faith, and engage with the Defaulting Banks with respect to a potential refinancing transaction.   Such requests were in clear contravention of the Defaulting Banks' unconditional obligation to fund the Utilization Requests, and there were no requirements that the RCF Debtors comply with such requests to receive funding.

74.     On April 18, 2023, the Company responded through counsel, noting that such demands had no basis under the Senior Facilities Agreement and that the Company expected the Defaulting Banks to comply with their legal obligations.   Still, the Defaulting Banks refused to fund.   Considering the Company's quickly deteriorating liquidity position, the Company and the

Advisors were forced to pivot to other alternatives. As of the Petition Date, the Defaulting Banks had not complied with their obligations under the Revolving Credit Facilities, leaving approximately AUD $76 million of the Revolving Credit Facilities left undrawn and causing the Company to experience a cash crisis.

75. With the large gap in funding left by the Defaulting Banks' refusal to meet their unconditional legal obligations, the Company, with the help of the Advisors, thoroughly evaluated the potential financing alternatives at its disposal. Due to the lack of basket capacity under the Senior Facilities Agreement for any senior financing, limited unencumbered collateral, and short amount of time before the Company would be cash-flow negative, there were no financing alternatives that could provide new money on an expedited timeline while also providing security to potential new money lenders. It became clear that obtaining DIP financing through lenders already familiar with the Company may be the best available alternative under the circumstances to stave off liquidation and preserve the value of the Company. Accordingly, PJT and K&E engaged in extensive negotiations with the AHG Advisors to (i) build consensus around a chapter 11 filing and near-term DIP financing and (ii) engage with lenders outside of the Ad Hoc Term Lender Group to build greater consensus for a restructuring.

76. Still, after initial engagement with the Ad Hoc Term Lender Group, it became clear that the Company's existing lenders would not be able to generate enough commitments to provide sufficient new money for the Company to continue its operations. Accordingly, on May 19, 2023, the Company publicly disclosed the material non-public information that had been disclosed to certain restricted lenders to facilitate trading to the greatest extent possible. The Company made this decision to ensure that the holders of the Company's funded debt are institutions which were also likely to fund into the DIP Facility. On May 22, 2023, the Company also lifted restrictions

on trading by expanding a "white list" of institutions that could purchase the Company's debt and allowed the Term Loan Facilities to trade freely.  The Company also held multiple lender calls to ensure that lenders understood the current situation regarding the Company and were in a position to support the Company's financing needs.  The Company also solicited a consent to amend the governing law of Senior Facilities Agreement from the laws of England and Wales to New York Law to help further facilitate the process.  The consent was executed and implemented on May 31, 2023.  Collectively, this strategy was successful and led to significant levels of trading and concentration, expanding the Ad Hoc Term Lender Group and increasing support for the DIP Facility.  Ultimately, after hard-fought negotiations, the Company and the Ad Hoc Term Lender Group reached a deal is documented in that certain term sheet (the "DIP Term Sheet").

A.    **Heightened Corporate Governance.**

77.    In connection with consideration of strategic restructuring alternatives, GenesisCare, in consultation with the Advisors, conducted a review of its existing corporate governance infrastructure.  The board of directors of TopCo (the "Board") determined that it was in the best interest of the Company and its stakeholders to appoint certain independent and disinterested directors at various entities in the Company's corporate structure that have each commenced chapter 11 cases (each such entity, a "Designated Subsidiary," and each board thereof, a "Board"):  (i) Jonathan Foster—as disinterested director and Alan Carr—as a KKR-designated independent director to TopCo; (ii) Carol Flaton—as disinterested director to GC Finance; (iii) Timothy Pohl—as disinterested director to Genesis Specialist Care Pty Ltd; and (iv) Neal Goldman—as disinterested director to GenesisCare USA Holdings, Inc. (collectively, the "Disinterested Directors").  The Board and each Subsidiary Board appointed the Disinterested Directors and vested them with the authority to, among other things, evaluate and negotiate financing transactions and/or other strategic alternatives for GenesisCare and its stakeholders,

including the possibilities of undertaking a restructuring, reorganization, and/or other recapitalization transaction.

**B.    DIP Financing.**

78.    By the DIP Motion, and as set forth in greater detail in the Singh Declaration[11] and the Fox Declaration[12] the Debtors seek authorization from the Court to enter into the DIP Facility. The Debtors require immediate access to additional liquidity to fund the administration of the chapter 11 cases, stabilize and continue operations, pay critical vendors (including all non-U.S. vendors), finance a marketing process and evaluate other strategic alternative for GC US, and pay down certain international debt obligations secured by collateral other than the collateral securing the Senior Facilities Agreement, among other things.

79.    The Debtors, through the assistance of the Advisors, thoroughly explored alternate opportunities for in-court financing, including engaging with various third-parties to determine the availability and viability of third-party financing either on a priming or junior-lien basis.  As part of the process, the Advisors communicated with several potential sources of financing outside the Debtors' capital structure that routinely provide DIP financing to determine their interest in providing such financing to the Debtors.  For various reasons as described in the Singh Declaration,

---

[11]    *See Declaration John Singh, Partner of PJT Partners LP, in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief, filed substantially contemporaneously herewith (the "Singh Declaration").*

[12]    *See Declaration of Brian J. Fox, Managing Director of Alvarez & Marsal Holdings LLP, Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief, filed substantially contemporaneously herewith (the "Fox Declaration").*

this process did not yield any financing offers—leaving the Debtors with no viable third-party alternative to the DIP Facility as proposed in the DIP Documents (as defined in the DIP Motion).

80.     In parallel, over the course of the last several weeks, the Debtors engaged in extensive, arm's-length, hard-fought negotiations with the Ad Hoc Term Lender Group (as well as the agent under the Senior Facilities Agreement and its counsel) concerning the terms of a postpetition financing facility (and consensual usage of cash collateral) to be provided by certain lenders under the Debtors' Senior Facilities Agreement and backstopped by the Ad Hoc Term Lender Group.  Several rounds of term sheets were exchanged between the parties before the DIP Facility was ultimately agreed.  Given the constraints imposed by the Debtors' existing capital structure, including the unlikelihood of obtaining postpetition financing on a junior basis to the prepetition Senior Facilities Agreement liens, the Debtors, in consultation with the Advisors, concluded that seeking postpetition financing from their existing lenders represented the only viable path to obtaining critically needed liquidity (without engaging in a costly and potentially drawn out priming fight at the outset of these cases).

81.     Accordingly, the Debtors and the Ad Hoc Term Lender Group negotiated a DIP Facility that will provide the Debtors with crucially required funding to administer these cases, fund the strategic alternatives process for their U.S. business, and continue operations, among other things.  The Debtors and the Ad Hoc Group (as defined in the DIP Motion) ultimately agreed upon the terms of a debtor-in-possession financing in the form of senior secured postpetition financing on a superpriority basis under (1) a new money, multi-draw term loan facility consisting of up to $200 million, and (2) a roll-up of prepetition Senior Facilities Agreement obligations in the amount of $600 million.

### C.     Proposed Timelines of these Chapter 11 Cases

82.     The DIP Documents require that the Debtors proceed expeditiously through chapter 11.  Specifically, the Ad Hoc Term Lender Group's commitments are contingent upon, among other things, the Debtors administering their chapter 11 cases in accordance with the milestones set forth therein, namely:

**Plan Milestones**

- Petition Date + 2 business days: Entry of Interim Order that is acceptable to the DIP Agents and the Requisite Lenders and reasonably acceptable to the Debtors;

- Petition Date + 35 days: entry of Final Order that is acceptable to the DIP Agents and the Requisite Lenders and the Debtors;

- Petition Date + 60 days: entry by Bankruptcy Court of an order approving the Disclosure Statement that is reasonably acceptable to the Requisite Lenders and the Debtors;

- Petition Date + 75 days: filing of a plan of reorganization that provides for the payment in full of all DIP obligations and is otherwise reasonably acceptable to the Requisite Lenders and the Debtors (an "Acceptable Plan") and disclosure statement with respect to an Acceptable Plan (the "Disclosure Statement") with the Bankruptcy Court;

- Plan Filing Date + 130 days: entry by Bankruptcy Court of an order confirming an Acceptable Plan that is reasonably acceptable to the Requisite Lenders and the Debtors; and

- Plan Filing Date + 150 days: consummation of the Acceptable Plan.

**US GC Sale Milestones**

- Petition Date + 40 days: delivery of a winddown plan for US GC;

- Petition Date + 45 days: entry of an order approving bidding procedures in respect of US GC;

- Petition Date +110 days: bid deadline for US GC;

- Petition Date + 115 days: commencement of an auction (if necessary);

- Petition Date + 125 days: entry of an order approving the sale of US GC;

- Petition Date + 145 days: consummation of the sale of US GC.

**VI.     Evidentiary Basis for Relief Requested in the First Day Motions.**[13]

83.     Contemporaneously with the filing of this Declaration, the Debtors filed a number of First Day Motions seeking relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and minimize disruption. I understand the Debtors intend to seek the entry of court orders approving each of the First Day Motions as soon as possible in accordance with chapter 11 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"). If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

84.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Bankruptcy Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as described more fully in each First Day Motion, the Debtors, in consultation with their advisors, carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.

85.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day

---

[13]     Any capitalized terms that is used, but not defined, in this section shall have the meaning ascribed to it in the applicable First Day Motion.

Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  For the reasons identified below and in each First Day Motion, I believe that the relief requested in each of the First Day Motions is narrowly tailored to avoid immediate and irreparable harm and is appropriate under the circumstances and should be granted by the Bankruptcy Court.

### Administrative and Procedural Motions

**A.**  **Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

86.   Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of the chapter 11 cases.  To that end, the Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' chapter 11 cases.  As in many large chapter 11 cases that are jointly administered, many of the motions, hearings, and orders in these chapter 11 cases will affect all Debtor entities. Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

87.   Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of these

chapter 11 cases.  Accordingly, the Debtors submit that the joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties in interest.

88.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Joint Administration Motion should be approved.

**B.     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Authorizing Service of Parties in Interest by Email, (III) Approving the Form and Manner of the Notice of Commencement, and (IV) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

89.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to redact certain personally identifiable information, (b) authorizing the service of parties in interest by email, (c) approving the form and manner of notice of commencement of these chapter 11 cases, and (d) granting related relief.

90.     Privacy protection regulations are being enacted in key jurisdictions.   The UK GDPR, the EU GDPR, the AU PA, and similar laws in other countries, impose significant constraints on the processing (which includes the transferring or disclosing) of information relating to identified or identifiable individuals (which includes names and home addresses of individuals). The UK GDPR and EU GDPR apply to the processing of Personal Data in the context of an establishment of a controller or processor in the United Kingdom or a European Economic Area member state regardless of whether the processing takes place in the United Kingdom or the European Economic Area (and, in some circumstances, organizations established in other countries when processing Personal Data relating to individuals located in the United Kingdom or European Economic Area).   The AU PA, on the other hand, applies to acts done or practices

engaged in inside or outside of Australia by agents or organizations that have an Australian link, which in the case of the Debtor includes carrying on business in Australia.

91.     Violators of the UK GDPR and EU GDPR risk severe penalties.  The UK GDPR and EU GDPR may apply to the Debtors, specifically as certain of the Debtors' may be processing data relating to their creditors, including vendors and other individual creditors, located in the United Kingdom or European Economic Area.   Similar to the UK GDPR and EU GDPR, non-compliance with the AU PA attracts large fines, with serious or repeated invasions of privacy garnering fines up to the greater of AUD 50,000,000, three times the value of benefits obtained or attributed to the breach, or 30 percent of the corporation's adjusted turnover during any breach turnover period.

92.     It is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, Schedules and Statements, claims register, and proofs of claim (a) the names, home and email addresses of individual creditors—including the Debtors' patients, employees, contract workers, former employees, vendors, and suppliers—and any individual equity holders who are citizens of the United States located in the United States, (b) all personally identifiable information of minors, and (c) the names, home and email addresses and other Personal Data of any natural person to the extent they are processed subject to the UK GDPR, EU GDPR, or AU PA because (x) such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams under section 107(c)(1) of the Bankruptcy Code, and (y) disclosure risks violating the CCPA, UK GDPR, EU GDPR, or AU PA exposing the Debtors to potential civil liability and significant financial penalties.

93.     The Debtors propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other filings redacted pursuant to the proposed order to (a) the Court, (b) the United States Trustee for the South District of Texas (the "U.S. Trustee"), (c) the proposed claims and noticing agent, (d) counsel to any official committee appointed in these chapter 11 cases, and (e) any party in interest upon a request to the Debtors (email being sufficient) or to the Court that is reasonably related to these chapter 11 cases.

94.     Absent such relief, the Debtors (a) may be in violation of applicable data privacy law and HIPAA, thereby exposing them to severe monetary penalties that could threaten the Debtors' operations during this sensitive stage of their efforts to maximize the value of their estates, (b) would unnecessarily render individuals more susceptible to identity theft, and (c) could jeopardize the safety of employees, contract workers, former employees, vendors, suppliers, and other individual creditors or individual equity holders who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home and email addresses without any advance notice or opportunity to opt out or take protective measures.

95.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Creditor Matrix Motion should be approved.

C.     **Debtors' Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent (the "Kroll Retention Application").**

96.     Pursuant to the Kroll Retention Application, the Debtors seek entry of an order appointing Kroll as Claims and Noticing Agent in the Debtors' chapter 11 cases, in accordance with the Engagement Letter, attached to the Kroll Retention Application as Exhibit A.  In support

38

of the Kroll Retention Application, the Debtors submit the Steele Declaration, attached to the Kroll Retention Application as Exhibit B.

97.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Kroll to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

98.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

99.     I believe that the relief requested in the Kroll Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Kroll Retention Application should be approved.

**D.      Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Reports, and (II) Granting Related Relief (the "SOFA Extension Motion").**

100.    Pursuant to the SOFA Extension Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their Schedules and Statements to and including July 31, 2023, fifty-nine days from the Petition Date, (b) extending the deadline by which the Debtors must file their initial 2015.3 Reports to and including the later of (i) fifteen days

after the 341 Meeting or (ii) July 17, 2023, forty-five days from the Petition Date, and (c) granting related relief.

101.    Ample cause exists to grant the relief requested herein.  To prepare their Schedules and Statements and 2015.3 Reports, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the fifty-four Debtor entities.  Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization and the globe, it may be some time before the Debtors are able to assemble together all of the information required to prepare the Schedules and Statements and 2015.3 Reports.

102.    Although the Debtors' management, employees, professional advisors, and key personnel have prepared diligently for these chapter 11 cases, preparing the Schedules and Statements and 2015.3 Reports was not practicable given the complex nature of the Debtors' business.  Prior to the Petition Date, the Debtors focused their efforts on preparing for a smooth transition into chapter 11 and negotiating with certain of the Debtors' lenders for a proposed debtor-in-possession financing facility.  Such efforts made it difficult for the Debtors to prepare the Schedules and Statements and 2015.3 Reports in advance of the Petition Date.

103.    I believe that the relief requested in the SOFA Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the SOFA Extension Motion should be approved.

E.    Debtors' **Emergency** Motion for Entry of an Order Authorizing the Implementation of Procedures to Protect Confidential Patient Information (the "**Patient Information Motion**").

104.    Pursuant to the Patient Information Motion, the Debtors seek entry of an order (a) authorizing the implementation of procedures to protect confidential patient information and (b) granting related relief.

105.    As a healthcare company, the Debtors are subject to various laws and regulations regarding the protection and confidentiality of patients' protected health information, including HIPAA.  These regulations impose stringent standards on healthcare providers and establish significant penalties for any healthcare provider that improperly uses or discloses patient information.  In addition, the Debtors are also party to business associate agreements with a variety of healthcare providers that impose contractual obligations on the Debtors to comply with HIPAA and to protect the PHI received from or used on behalf of these entities.  If the Debtors were to violate these regulations or contractual obligations, it would result in significant monetary penalties or threaten essential business relationships with healthcare providers.  The Debtors relationships with such healthcare providers constitute a key source of revenue for the Debtors.

106.    For these reasons, I believe that the relief requested in the Patient Information Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to maximize the value of the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Patient Information Motion should be approved.

F.     **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay to Proceed with Litigation or Contested Matters Commenced Prepetition, and (III) Approving the Related Form and Manner of Notice (the "<u>Automatic Stay Motion</u>").**

107.   Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order, (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code; (b) modifying the automatic stay, to the extent the Debtors deem appropriate in consultation with the Ad Hoc Term Lender Group to proceed with litigation or contested matters commenced before the Petition Date; and (c) approving the form and manner of notice related thereto, substantially in the form attached to the Automatic Stay Order as <u>Exhibit 2</u>. The Debtors further seek authority to translate the Automatic Stay Motion and the related order and notice into other languages to better inform creditors, governmental units, and interested parties of the relief requested in the Automatic Stay Motion.

108.   The Debtors' operational reach spans across a number of countries, with over 350 locations across the United States, Australia, the United Kingdom, and Spain. It would be an understatement to say that many of the Debtors' key operations depend upon key relationships with foreign vendors and international entities.

109.   The Debtors and their affiliates are incorporated or formed under the laws of a number of foreign countries, including Australia, the United Kingdom, Hong Kong, and Spain. The global reach of the Debtors' businesses requires partnerships with various international third-party vendors and suppliers that provide goods and services necessary to maintain the Debtors' continued operations. In the ordinary course of business, the Debtors rely on suppliers, service providers, and other creditors that are based outside the United States. These

goods and services are highly specialized and vital to preserving the value of the Debtors' businesses.

110.    The Debtors rely on certain non-U.S. suppliers to provide a steady flow of supplies and services, including medical supplies, medical equipment, and regular maintenance services for their medical facilities.  Without continued support from their non-U.S. suppliers, the Debtors would face severe interruptions to their daily operations.  Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of their businesses, which could impair stakeholder value at the outset of these chapter 11 cases.  Pursuant to the Vendors Motion, the Debtors seek authority to, among other things, continue their businesses in the ordinary course and satisfy certain prepetition and postpetition claims of non-U.S. vendors.  The Debtors anticipate that the relief granted in the Automatic Stay Motion will help deter parties in interest from attempting to exercise remedies or take adverse action against the Debtors in non-U.S. jurisdictions on account of the commencement of these chapter 11 cases.

111.    Further, many of the Debtors' foreign suppliers lack meaningful, if any, contacts with the United States.  Non-U.S. creditors and contract counterparties operating in non-U.S. jurisdictions may be unfamiliar with the chapter 11 process, the scope of a debtor-in-possession's authority to operate its business, or the importance and implications of the automatic stay.  As discussed in the Vendors Motion, certain of the Debtors' non-U.S. creditors—and others—could attempt to file lawsuits in foreign courts and exercise other remedies in foreign jurisdictions, violating the automatic stay to the detriment of the Debtors, their estates, and creditors.  Because of the nature of their global operations, significant assets owned by the Debtors are located outside of the U.S., which amplifies cause for concern.

112.    Finally, the Debtors are party to certain international leases and executory contracts, including supply-related contracts for medical equipment.  Non-U.S. counterparties thereto could attempt to terminate such leases or contracts upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions, violating sections 362 and 365 of the Bankruptcy Code. Similarly, governmental units outside the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, or other similar grants held by a chapter 11 debtor and required for the Debtors' ongoing business operations, violating section 525 of the Bankruptcy Code.

113.    The Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  The Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with this Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help protect the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

114.    I believe that the relief requested in the Automatic Stay Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Automatic Stay Motion should be approved.

**Operational Motions**

G.     **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "<u>DIP Motion</u>").**

115.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain postpetition debtor-in-possession financing.   Additional evidentiary support for the DIP Motion is provided in the Singh and Fox Declarations filed contemporaneously therewith.

116.     The Debtors require immediate access to the DIP Facility in addition to continued use of Cash Collateral to fund operations, capital expenditures, and the administrative costs of these chapter 11 cases.  The proposed DIP Facility will stabilize the Debtors' business operations and facilitate a smooth entry into these chapter 11 cases.  The DIP Facility will also provide the funding means to accomplish a comprehensive restructuring, including pursuing a strategic alternatives process for the U.S. Business.  Further, the DIP Facility will and ensure the Debtors' ability to operate as a going concern during these cases, preserving value of the Debtors' estates for the benefit of their stakeholders.  In addition, without access to Cash Collateral and the liquidity provided by the DIP Facility, the Debtors would be unable to operate their business and administer their estates, which would immediately and irreparably harm their stakeholders.

117.     If approved, the DIP Facility will provide the Debtors with access to crucially needed liquidity that will enable the Debtors to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs, make payments to certain critical vendors (including all non-US vendors), satisfy certain non-US debt obligations, and administer these chapter 11 cases, in each case in accordance with the agreed-upon Budget,

including, at the outset of these cases, the Initial DIP Budget.  As security for the DIP Loans, all of the Debtors will guarantee the obligations under the DIP Facility and grant the liens described in the DIP Motion.

118.    The Debtors do not have alternative sources of financing readily available with terms better than those included in the DIP Facility.  The Debtors received no third-party financing proposals and determined, in consultation with their advisors, that the DIP Facility provided by the DIP Lenders represented the only viable path (absent a priming fight at the outset of these cases) to obtaining crucial funding.   Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the DIP Motion.

**H.    Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

119.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (ii) continue intercompany transactions and funding consistent with their historical practices, and (iii) maintain existing business forms and books and records in the ordinary course of business, and (b) granting related relief.

120.    In the ordinary course of business, GenesisCare maintains a sophisticated, global cash management system to facilitate the timely and efficient collection, management, and disbursement of funds.  An illustrative schematic of the Cash Management System is attached to the Cash Management Motion as <u>Exhibit A.</u>

46

121.     The Cash Management System includes a total of approximately 180 bank accounts, including 98 Bank Accounts held by Debtors.  A list of the Bank Accounts is attached to the Cash Management Motion as <u>Exhibit B</u>.  The Bank Accounts are maintained by 44 Debtor entities at four different financial institutions:  Wells Fargo, ANZ Bank, Commbank, and HSBC.  The Debtors maintain a majority of their Bank Accounts with Wells Fargo.

122.     The Debtors use the Cash Management System to collect, transfer, and distribute funds and to facilitate cash monitoring, forecasting, and reporting for the entire enterprise, including with affiliated professional corporations, including those operating under the OnCure brand name.  The Cash Management System is typical for healthcare organizations of similar size and is designed to manage the Debtors' cash flow in a cost-effective and efficient manner.  GenesisCare's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with certain Intercompany Transactions.  GenesisCare's treasury and accounting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

123.     Given the economic and operational scale and complexity of the Debtors' healthcare enterprise, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders, including the Debtors' patients.  To minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue utilizing their existing Cash Management System during the course of these chapter 11 cases, subject to the terms described in the Cash Management Motion.

124.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Cash Management Motion should be approved.

**I.      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

125.    Pursuant to the Wages Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including paying certain prepetition obligations related thereto, and (b) granting related relief.  As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Compensation and Benefits Programs is approximately $132,735,000.

126.    The Debtors' ability to provide quality patient care at their numerous medical facilities in the United States, the United Kingdom, and Australia depends on the continued service and morale of the Debtors' workforce.  As of the Petition Date, the Debtors employ approximately 5,540 Employees, including approximately 4,530 full-time Employees, approximately 850 part-time Employees, and approximately 160 Employees hired through outside temporary employment agencies.  Approximately 2,880 Employees are paid on an hourly basis and the remaining approximately 2,510 Employees are paid on a salaried basis.  As a healthcare company, the Debtors employ or contract with numerous individuals with advanced medical training, including approximately 420 physicians.

127.    While Employees located in the United States are not unionized, certain Employees in other countries are members of Foreign Unions.  For example, certain non-U.S. Employees located in Australia are members of a Foreign Union and party to EBAs with the Debtors.

128.    The Debtors' Employees perform a variety of critical functions including operating the Debtors' cancer treatment centers, providing radiation oncology, medical oncology, diagnostic services, gynecological and general surgery, and urology services, and recruiting and training physicians and technicians.  Employees also engage in various functions to manage and support the operations of the Debtors' cancer care services, including various administrative, marketing, legal, accounting, finance, and management-related tasks.  Many of the Debtors' Employees are highly skilled physicians, nurses, radiation therapists, physicists, and other clinical staff.  The skills and experience of the Debtors' Employees are essential to the Debtors' ongoing operations. In many instances, the Employees are distinctly familiar with the Debtors' cancer services, clinical practices, processes, and systems and possess specialized knowledge, skills, or experience that cannot be easily replaced.  Finally, many of the Debtors' medical professionals, including its medical oncologists, physicists, and radiation therapists, are in short supply.  Due to the high demand for individuals with these skill sets, if such an Employee were to leave, it would be nearly impossible to replace them with someone with a similar expertise

129.    The Debtors pay the majority of their Employees' Wages on either a salaried or hourly basis.  As a material component of their compensation, however, the Debtors pay approximately 420 physicians a variable compensation ("Variable Compensation," and together with Wages, "Compensation").  The Variable Compensation arrangements are negotiated in the employment agreement of each physician on a case-by-case basis.  In general, the Variable Compensation is paid on either a monthly or quarterly basis.  It is generally dependent upon the

applicable physician achieving specific performance metrics, including, but not limited to, productivity, compliance, quality improvement, and practice enhancement and growth. Performance generally is measured on either a monthly, quarterly, or annual basis and payments are remitted in the month following the relevant performance period.  For calendar year 2022, the average monthly payments on account of Variable Compensation totaled $9 million.  The Debtors' obligations on account of Variable Compensation may vary due to a variety of factors including physician performance.  The Variable Compensation is a critical component of the participating physicians' overall compensation package.

130.     The only Employees that the Debtors believe may be owed accrued and unpaid Compensation as of the Petition Date are 290 of the Company's physicians, who are owed prepetition accrued Variable Compensation that may exceed the priority cap set forth in section 507 of the Bankruptcy Code.  None of these Employees are insiders, with this entire group being comprised of physicians and medical professionals necessary for the uninterrupted provision of patient care and operation of the business.

131.     The vast majority of the Employees rely on compensation funded by the Debtors to pay their daily living expenses and to support their families.  These workers will be exposed to significant financial hardship if the Debtors are not permitted to continue paying these amounts in the ordinary course.  Similarly, U.S. Employees and certain Non-U.S. Employees rely on health and other benefits provided by the Debtors to meet their and their families' health and other daily needs.  These Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefit programs during these chapter 11 cases.  Consequently, the relief requested in the Wages Motion is necessary and appropriate.

132.    The Debtors seek to minimize the personal financial burden Employees would suffer if prepetition Compensation and Benefit Programs are not paid or remitted when due or as expected.  As such, by the Wages Motion, the Debtors seek authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, variable compensation, temporary agency fees, reimbursable expenses, withholding and deduction obligations, payroll processing and related obligations, non-insider severance program, non-insider incentive and bonus programs, disinterested director compensation, health and welfare programs, workers' compensation programs, salary continuation insurance, 401(k) plan, non-qualified deferred compensation plan, pension plan, PTO benefits, and miscellaneous employee benefits; and certain other benefits that the Debtors have historically provided in the ordinary course, all as set forth more fully in the Wages Motion.

133.    I believe the Employees are the Debtors' most important asset.  The ability to pay prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Any loss of Compensation would cause the Employees to experience substantial financial hardship and would likely result in Employee departures.  Due to the limited number of, and high demand for, physicians with the specific skillset necessary to provide care to the Debtors' patients, the Debtors would likely be unable to hire a replacement should a physician resign.  Because the Debtors' ordinary course operations and continued provision of quality patient care depend on Employees' continued service, it is imperative that Debtors be authorized to pay their Employees any accrued but unpaid Compensation and to continue honoring and paying Compensation obligations in the ordinary course postpetition consistent with past practices.

134.    For these reasons, I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Wages Motion should be approved.

**J.      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations, (B) Obtain new Professional Corporation Contracts, and (II) Granting Related Relief (the "<u>Physician Contracts Motion</u>").**

135.    Pursuant to the Physician Contract Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations incurred in relation to the Professional Corporations, including obligations pursuant to the Existing Professional Corporation Contracts and (b) enter into and honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations related to attracting, seeking, entering into, and maintaining New Professional Corporation Contracts, and (ii) granting related relief.

136.    A material portion of the Debtors' revenue is derived from providing management and administrative services to various affiliated entities that in turn provide medical services to patients.  Because the Debtors operate nationwide in the United States, they are subject to a variety of state laws regulating entities that administratively support medical providers or practice medicine or both.  To comply with the variety of laws regulating their business and contractual arrangements, the Debtors utilize a structure commonly known in the industry as a "friendly professional corporation" structure pursuant to which the Debtors contract with and provide various management and administrative services to professional entities that are owned exclusively by licensed physicians affiliated with the Debtors in accordance with applicable requirements. This structure provides the Debtors with certain control over the non-clinical business management

and administrative functions of the Professional Corporations, allowing the PC Physicians to focus on providing high-quality medical services to patients rather than managing the non-clinical aspects of the Professional Corporations.  In these arrangements, the PC Physicians are either employed directly by the Professional Corporations or are separately employed directly by the Debtors pursuant to typical employment agreements for non-clinical services or both.  As of the Petition Date, the Debtors provide management and administrative services to twenty-seven Professional Corporations.  The clinicians working at the Professional Corporations provide radiation oncology, medical oncology, surgical oncology, and urology services, among other clinical services, to patients.

137.    The Debtors' relationships with the Professional Corporations are contractual in nature.  In most cases, Debtor entities provide management and other services pursuant to PC Management Services Agreements.  The management services provided by the Debtors pursuant to the PC Management Services Agreements typically include, but are not limited to: managing provider enrollment in government and commercial payor programs; managing billing and collection; granting licenses allowing the Professional Corporations to use the Debtors' computer software and hardware; arranging for the purchase of supplies; ordering of requested medical equipment; hiring of non-clinical and administrative personnel; protecting confidential information; assisting with licensing and accreditation; and supporting implementation of policy and procedures, accounting and budgeting, contract negotiation, general legal services and litigation needs, taxes support, marketing and advertising needs, facility and fixture maintenance, quality assurance and compliance, and other day-to-day administrative needs.

138.    The Debtors have various ongoing obligations and incur certain costs under the Professional Corporation Contracts, including the provision of Insurance Coverage and the

payment of income taxes and Licensing Costs.  In addition, the Debtors have agreed to indemnify the Professional Corporations for certain losses, including, to the extent applicable, losses caused by the Debtors' provision of the management services.  The Debtors' ability to continue to provide management and administrative services to Professional Corporations are a material source of the Debtors' operating revenues during these chapter 11 cases.  Professional Corporations generated over $79 million in revenue for the Debtors in 2022.  In 2022, the Debtors remitted approximately $108.5 million to the PC Physicians and vendors as part of the PC Operating Costs pursuant to the Existing Professional Corporation Contracts.

139.    The inability to provide management services per the existing relationships or develop new management services relationships with Professional Corporations would greatly inhibit the Debtors' ability to support the PC in providing high-quality clinical care to patients and fulfill their contractual obligations under management services agreements.   The Debtor's provision of services to Professional Corporations accounts for approximately twenty percent of the Debtors' business in the United States.  The expiration, default, termination, or cancellation of Existing Professional Corporation Contracts or the failure to execute New Professional Corporation Contracts would immediately reduce revenue and negatively impact the Professional Corporations' ability to provide high quality patient care.

140.    I believe that the relief requested in the Physician Contracts Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Physician Contracts Motion should be approved.

**K.      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

141.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an interim order and a final order (a) authorizing the debtors to maintain and administer prepetition customer programs and honor certain prepetition obligations related thereto and (b) granting related relief.

142.     Various contractual obligations, as well as various Regulations, require in certain instances the Debtors to refund patients and other third parties, including healthcare insurers (commonly known as payers), managed care organizations, workers' compensation programs, contract management services, other commercial plans, federal health care programs such as Medicare and Medicaid, the United States Department of Veterans Affairs, and international government entities.  As described in greater detail in the Customer Programs Motion, the Debtors may owe refunds to Refund Recipients as a result of overpayment by such parties.  In the ordinary course of business, the Debtors routinely issue refunds or, in lieu of issuing refunds, offset amounts ultimately owed to Refund Recipients resulting from the interaction between the Debtors' contractual obligations, billing procedures, patient medical insurance deductibles, and third-party payments.

143.     In the ordinary course of business, the Debtors also offer certain of their Australian patients Bulk Billing on certain of the Debtors' medical treatment services in accordance with the Radiation Oncology Health Program Grants (the "<u>ROHPG</u>"), a program through which the Australian government promotes affordable healthcare services in underserved communities. Bulk Billing is a payment option under the Medicare system in Australia, where a healthcare services provider is paid a portion of the scheduled service fee for treatment by billing the government through the patient's Medicare card.  As a result, the patient does not pay for

treatment.  The healthcare services provider receives only a fixed proportion of the scheduled fee that a patient would otherwise pay if the patient was privately billed, but avoids the costs and risks associated with billing and debt collection.  In exchange for meeting certain requirements of the ROHPG, including providing Bulk Billing, the Debtors receive Grants associated with the costs of operating the Debtors' business, including buying or replacing LINACs.

144.    Finally, in the ordinary course of business, the Debtors also offer certain healthcare insurers doing business with the Debtors in the United Kingdom Rebates.  Such Rebates are offered to these healthcare insurers as an incentive for referring their customers to the Debtors' medical facilities for treatment and thereby expanding the Debtors' customer base.

145.    The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

146.    I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Customer Programs Motion should be approved.

**L.      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered Into Prepetition and Satisfy Obligations Related Thereto, (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (D) Continue to Pay Brokerage Fees and Claims Administration Fees, and (E) Maintain the Surety Bond Program, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

147.    Pursuant to the Insurance Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (a) authorizing the Debtors to (i) continue their prepetition insurance coverage and

satisfy prepetition obligations related thereto, (ii) honor and renew the premium financing agreement entered into prepetition and satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, (iii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (iv) pay prepetition obligations on account of and continue to pay Brokerage Fees and Claims Administration Fees on a postpetition basis in the ordinary course, and (v) maintain the Surety Bond Program and Letters of Credit, and (b) granting related relief.

148.    The Debtors maintain 192 Insurance Policies with 77 Insurance Carriers.  The Insurance Policies provide coverage for, among other things, losses related to the Debtors' real and personal property, professional and general liability, crime liability, cyber liability, directors' and officers' liability, automobile liability, storage tank liability, workers' compensation, product liability, international package, flood, physician group and non-group malpractice liability, and employer and employment practices liability.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.  A schedule of the Insurance Policies is attached as Exhibit A to the Insurance Order.

149.    The Debtors generally pay Premiums directly or through brokerage accounts.  The Debtors pay these Premiums (a) in full on or around the start of each policy period, (b) through a Premium Financing Agreement, or (c) in monthly or quarterly installments.  The Debtors paid an aggregate amount of approximately $16.7 million in Premiums in 2022–2023, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.  Generally, the Insurance Policies range from one year to two years in length and renew at various times throughout the year.  The 21st Century director and officer runoff policy and the Australia healthcare excess policy have longer terms, ending in 2026 and 2029, respectively.  Certain

Insurance Policies are subject to a Premium audit at the end of the term, including the commercial automobile and workers' compensation Insurance Policies in the U.S. and the workers' compensation Insurance Policy in Australia.  Currently, no audits are taking place.  Audits will likely begin in August 2023.

150.    In some instances, the Debtors also obtain Tail Coverage of certain of their Insurance Policies.  For example, the debtors occasionally obtain medical malpractice insurance coverage to insure physicians who have left the Company with regard to malpractice claims based on events that took place while the physician was employed at the Company.  Tail Coverage may be paid for in full or paid in installments.  The cost of Tail Coverage is extremely variable and depends on the contractual obligations under the policies, as well as the policy's underlying risk factors.  In the case of medical malpractice, endorsements are made by the individual physician, but the Debtors may be obligated to pay for the Tail Coverage.

151.    Thirteen of the Insurance Policies were financed through Premium Financing Agreements between First Insurance Funding and the Debtors' U.S. entities.  Pursuant to the Premium Financing Agreement, the PF Lender agreed to pay the insurance premiums due under the Insurance Policies in exchange for payments from the Debtors, as set forth more fully below. The PF Lender had a security interest in the financed policies and any additional premium required under the financed policies.  The aggregate annual premium for the Insurance Policies financed under the Premium Financing Agreements was approximately $2.45 million plus applicable taxes and surcharges with an annual interest rate of 4.49 percent.  Pursuant to the Premium Financing Agreement, the Debtors paid the financing premiums through monthly installments, which began on August 1, 2022, and ended on May 1, 2023, for the insurance coverage provided for the Debtors under the Premium Financing Agreement.

152.    Certain of the Insurance Policies require the Debtors to pay Deductibles.  Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs or successful or settled claims up to the amount of the Deductible.  Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible.  The Deductibles may range up to $1 million, subject to certain limitations.

153.    The Debtors obtain the majority of their corporate Insurance Policies through two insurance brokers, Aon Risk Services Central Inc. and HDL Insurance Brokers Pty Limited.  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage and with procuring and negotiating the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates.  The Insurance Brokers collect Brokerage Fees.

154.    The Debtors also employ several claims administrators to administer and pay certain professional and general liability claims related to the Insurance Policies on behalf of the Debtors' U.S. entities.  Generally, if a property claim is made against the Debtors, Sedgwick Claims Management Services will administer, settle, adjust, or otherwise handle the claim and make any payments in connection therewith.  Corporate claims and workers' compensation claims are administered by Zurich American Insurance Company, respectively.  Outside of the U.S., there are no claims administrators.  The fees paid for Claims Administration Fees are variable.  The Claims Administrative Fees due to Sedgwick are paid as part of the deductible and are settled when the deductible is paid.  Over the last six months, the Debtors paid an average of $40,000 per month to Zurich American Insurance Company.

155.    In the ordinary course of business, the Debtors maintain (i) five (5) surety bonds that are required under certain state Medicaid programs, issued by Hartford Fire Insurance

Company and (ii) one (1) fiscal intermediary services bond.  The Debtors obtain the Surety Bonds through Aon and pay fees when the Surety Bonds are arranged.  As of the Petition Date, the Debtors have approximately six (6) Surety Bonds totaling approximately $700,000, the premiums for which are approximately $18,000.  The Debtors have provided the Letters of Credit in the approximate aggregate amount of $8.2 million.  HSBC and Wells Fargo issued the Letters of Credit needed to ensure the Deductibles under the Insurance Policies are covered.

156.    To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies.  In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies.  It is particularly important to maintain comprehensive insurance in the current economic environment as the healthcare industry continues to recover from the impacts of the global COVID-19 pandemic.  The relief requested in this motion is to ensure uninterrupted coverage under the Insurance Policies.  Therefore, the Debtors seek authority to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related thereto, renew, amend, supplement, extend, or purchase new Insurance Policies, and maintain the Surety Bond Program and Letters of Credit on a postpetition basis in the ordinary course of business consistent with past practice.  Therefore, the Debtors seek authority to maintain the existing Insurance Policies and brokerage accounts, maintain the Surety Bond Program and Letters of Credit (each as defined below), pay prepetition obligations (if any) related thereto upon entry of the Order, and to renew, amend, supplement, extend, or, in consultation with the Ad Hoc Term Lender Group, purchase new Insurance Policies, Surety Bonds, and Letters of Credit on a postpetition basis in the ordinary course of business consistent with past practice.

157.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Insurance Motion should be approved.

M.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

158.    Pursuant to the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date), without regard to whether such obligations accrued or arose before or after the Petition Date and (b) granting related relief.

159.    In the ordinary course of business, the Debtors collect, withhold, and incur value-added taxes, sales taxes, use taxes, income taxes, franchise taxes, and property taxes, as well as other governmental taxes, interest, penalties, fees, assessments, and audits.  The Debtors pay or remit, as applicable, Taxes and Fees to various Authorities on a periodic basis (monthly, quarterly, semi-annually, or annually) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  A schedule identifying the Authorities is attached to the Taxes Motion as <u>Exhibit A</u>.  The Debtors generally, but not exclusively, pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or have the amount of such credits refunded to the Debtors.

61

160.     Additionally, the Debtors may become subject to routine Audits during these chapter 11 cases and certain of the Debtors are currently subject to an ongoing Audit.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors.

161.     Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in some instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' chapter 11 cases.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

162.     I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Taxes Motion should be approved.

**N.**    **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Patient Care and Safety Vendors, (B) 503(B)(9) Claimants, (C) Lien, Warehousemen, Shippers, and Certain Other Trade Claimants, (D) Critical Vendors, and (E) Foreign Claimants, and (II) Granting Related Relief (the "<u>Vendors Motion</u>").**

163.    Pursuant to the Vendor Motion, the Debtors seek entry of an interim order and a final order (a) authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims of (i) Patient Care and Safety Vendors, (ii) 503(b)(9) Claimants , (iii) Lien, Warehousemen, Shippers, and Certain Other Trade Claimants, (iv) Critical Vendors; and (v) Foreign Claimants, and (b) granting related relief.

164.    The Debtors' vendors and suppliers are a critical component of the Debtors' ability to manage safe medical facilities and provide high-quality care to patients.  The Debtors' cancer treatment centers require a steady supply of goods and services from Patient Care and Safety Vendors to provide essential healthcare services and to maintain safe medical facilities.  Any disruption in the provision of these critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business and could jeopardize the well-being of the Debtors' patients.

165.    The Debtors work with service providers to, among other things, obtain chemotherapy supplies, including infusion agents, repair medical equipment and comply with medical waste disposal and environmental regulations.  In many cases, these goods and services are highly specialized and technologically complex, and in some cases may give rise to mechanic's, possessory, or other liens.  In most cases, the ability to find replacement vendors for these goods and services would be difficult, if not impossible.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' business and ultimately harm the quality of the Debtors' patient

care.  In addition, suppliers of certain goods utilized by or provided to the Debtors may have delivered goods within the twenty days immediately preceding the Petition Date, giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code. Finally, the Debtors have obligations to various vendors utilized by the Debtors in the ordinary course that are highly critical to the Debtors' business operations and could not be replaced without causing irreparable harm to the Debtors' business.

166.    As of the Petition Date, the Debtors owe approximately $84.9 million on account of prepetition payables to the Debtors' Patient Care and Safety Vendors, 503(b)(9) Claimants, the Lien Claimants, Critical Vendors, and Foreign Claimants.  By the Vendor Motion, the Debtors seek authority to pay undisputed prepetition claims held by certain Patient Care and Safety Vendors, 503(b)(9) Claimants, the Lien Claimants, Critical Vendors, and Foreign Claimants and accrued in the ordinary course of business as such claims become due and payable in the ordinary course of business.  The relief requested will minimize any disruption to the Debtors' business, allow for a smooth and expeditious reorganization in these chapter 11 cases.

167.    *__The Patient Care and Safety Vendors.__*    As cancer care treatment, radiology services, and healthcare providers, the Debtors operate in an industry that is heavily regulated and closely scrutinized in each of the countries they operate in.  To operate and maintain their medical facilities, the Debtors rely on a steady flow of supplies and services, including medical supplies, medical equipment, and regular maintenance services.  The Debtors' ability to succeed in the healthcare space relies, among other things, on their business relationships with the Patient Care and Safety Vendors.  In some cases, local, state, and/or national law require that the Debtors maintain contracts with certain Patient Care and Safety Vendors, including those needed to comply with regulations applicable to the Debtors' medical facilities.

168.     The Patient Care and Safety Vendors are distinguishable from other vendors that are critical to the Debtors' business in that the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to operate medical service facilities and meet regulatory requirements.  The extensive, comprehensive regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.

169.     The Patient Care and Safety Vendors include those vendors who provide equipment, supplies, technology, products, and services that are mission-critical to the operation of the Debtors' business, such as prescription drugs, medical equipment and supplies, regulatory compliance, internal audits, payment processing, digital tools, and operations.

170.     In many instances, the Patient Care and Safety Vendors are the only vendors able to produce or deliver the products or services sufficient to meet the Debtors' operational needs. If certain Patient Care and Safety Vendors refuse to provide products and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several months, resulting in a detrimental impact to the Debtors' customer interface, brand messaging efforts, and general operational stability.  In some cases, there may be no true replacement if a relationship with a Patient Care and Safety Vendor falters.  Even where alternative vendors exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' estates and to the quality of cancer patient care.

171.     Without the ability to continue payment of Patient Care and Safety Vendors' claims the Debtors risk harming not only the going-concern value of their business, but the integrity of

their facilities, compliance with regulatory laws, the quality of medical care provided, and the safety of doctors, staff, and patients.

172.    ***The 503(b)(9) Claimants.***    The Debtors may have received certain inventory, goods, and/or materials from the 503(b)(9) Claimants within the twenty days immediately preceding the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Instead, the Debtors obtain much of their medical supplies, pharmaceuticals, and equipment from such claimants on an order-by-order or as-needed basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' business depends on the steady flow of medical equipment and supplies to provide patient care.

173.    Certain 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.  Even though the manufacture of certain goods, such as prescription medicine or bespoke healthcare products, may be completed, the 503(b)(9) Claimants may refuse to ship on a postpetition basis unless the Debtors pay some or all of the prepetition claims owing to such vendors.  Any interruption in the flow of these goods would be highly disruptive to the Debtors' operations and ultimately value-destructive for the Debtors' businesses.

174.    ***Lien Claimants.***  The Debtors routinely do business with a number of vendors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.  These Lien Claimants perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' facilities, maintenance and improvement of the Debtors' real property and facilities, logistics service providers, including shippers, warehousemen, manufacturing component parts necessary for the Debtors' operating and specialized medical

66

equipment, informational technology services, repair, renovation, or construction of the facilities and property therein.

175.    The Debtors' medical facilities require specialized maintenance and repair services provided by third parties on a regular or *ad hoc* basis.  Repairing defects in the Debtors' medical equipment, an essential part of the Debtors' operations, also requires the work of specialized third-party servicers.  Such specialized maintenance and repairs ensure the uninterrupted operations of the Debtors' facilities and that the Debtors continue to provide patient care in accordance with their high standards of service and safety for patients and employees.

176.    Non-payment of the claims of Lien Claimants hired in connection therewith could lead to an inability to obtain skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.  Any of these events would affect the Debtors' anticipated costs and timetables for such projects.  The cost of a project may vary significantly from initial expectations, and the Debtors may have a limited amount of capital resources to fund cost overruns which, in turn, would delay the completion of the project until adequate funding is available.  Such delay would be value-destructive to the Debtors' estates and the Debtors' business.

177.    The Debtors' business model requires them to work with certain warehouses to store various types of medical and patient care supplies.  The Debtors also partner with certain shippers to conduct smooth and fast deliveries of expensive medical equipment and highly perishable medical supplies, such as intravenous liquids and injections.  Possible loss of long-term relationships with the warehousemen and shippers could result in catastrophic injuries to cancer patients getting treatment in the Debtors' facilities, may cause serious reputational, financial, and logistical damage to the Debtors' business.

178.   ***Critical Vendors***.  The Debtors are in the highly complex and heavily regulated business of providing essential healthcare to patients all around the world.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to effectively manage the complex process by which they treat their patients, from the initial point of scheduling appointments through the complex process by which patients and payors are billed and pay for the medical services provided by the Debtors.  The Debtors rely on products and services provided by certain vendors that enable them to effectively manage this complex process.

179.   In light of these concerns, the Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the Critical Vendors that supply the products and services most vital to the Debtors' go-forward operations using the criteria set forth in the Vendor Motion.

180.   ***Foreign Claimants.***  A critical component of the Debtors' businesses, such as the Debtors' business activities in the European Union, the United Kingdom, and Australia, involves transacting with Foreign Claimants.  The Foreign Claimants supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these chapter 11 cases.  Due to the broad international reach of the Debtors' businesses, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S. based vendor rather than the Foreign Claimants.  Moreover, many of the Debtors' Foreign Claimants are irreplaceable due to the specialized and customized nature of their products and

services specific to the Debtors' international operations.  Failure to pay prepetition claims held by certain Foreign Claimants and accrued in the ordinary course of business could cause such Foreign Claimants to refuse to provide the goods and services necessary for the Debtors to continue business operations, including potentially forcing closure of operations at cancer treatment facilities essential for preserving ongoing business.

181.    Many of the Foreign Claimants lack meaningful, if any, contacts with the United States.  Thus, the Foreign Claimants may consider themselves beyond the jurisdiction of the Court, and therefore, may disregard (or simply be unaware of) the automatic stay, notwithstanding the global effect.  Efforts to exercise remedies in non-U.S. jurisdictions, including lawsuits in non-U.S. courts and the assertion of liens by the Foreign Claimants, could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims. It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in the creditor's home country in many instances, thereby compounding the loss and disruption in services.  Further, the Debtors believe that failure to remain current with trade counterparties outside the United States may result in those trade counterparties exercising termination and default rights under trade contracts and/or debt recovery rights in those jurisdictions which may lead to the liquidation of the Debtors.  Of particular concern, in Australia, failing to pay trade creditors could result in the need to commence a voluntary administration—a process which would operate in competition with these proceedings and where the Debtors' current leadership, the group best positioned to operate the Debtors' business, would be replaced by a registered liquidator with respect to the Group's Australian business, which is anticipated to be the key drivers of value in the future.

182.    I believe that the relief requested in the Vendor Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Vendor Motion should be approved.

O.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Certain Fee Payments for Services Performed, and (V) Granting Related Relief (the "<u>Utilities Motion</u>").**

183.    Pursuant to the Utilities Motion, The Debtors seek entry of an order (a) approving the Proposed Adequate Assurance Deposit for future utility services, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures for resolving any dispute in connection with the Adequate Assurance Deposit, (d) authorizing fee payments to certain parties for services performed, and (e) granting related relief.

184.    The Debtors incur utility expenses in the ordinary course of business for, among other things, water, waste, medical waste, hazardous materials, electricity, gas, telephone service, data service, and other similar services from more than 240 Utility Providers located throughout the United States to operate their businesses and manage their properties in the ordinary course. A non-exclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion Order as <u>Exhibit A</u>.

185.    On average, the Debtors spend approximately $1.24 million per month on utilities. Accordingly, the Debtors estimate that their cost for Utility Services during the next month (not including any deposits to be paid) will be approximately $1.24 million.

186.    Uninterrupted Utility Services are essential to the Debtors' ongoing healthcare operations and their ability to provide care to patients.  On any given business day, patients undergo procedures and receive medical treatments for which sophisticated equipment powered by the Utility Services is essential.  While any interruption in Utility Services would certainly be very detrimental to the Debtors' business, any interruption of the Utility Services, no matter how brief, could be extremely harmful to the patients at the Debtors' facilities.  Uninterrupted Utility Services are essential to the Debtors' ongoing operations and their ability to provide care to their patients. Without Utility Services, the Debtors' operations will shut down and patients could be harmed.

187.    For the Debtors' operation in the United States, the majority of the Debtors' utility accounts, including certain electricity, telecommunications, cable, gas, water, sewer, and waste services accounts, are managed through the Third-Party Payors.  For all utility accounts managed by the Third-Party Payors, the Utility Providers remit invoices to the Third-Party Payors.

188.    For several of the Debtors' locations, Utility Services are billed directly to the Debtors' Landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease arrangements.  As such, the Proposed Adequate Assurance does not allocate any amounts toward these Utility Providers because they do not directly rely on the Debtors for payment for their services.  Out of an abundance of caution, however, the relief requested in the Utilities Motion is requested with respect to all Utility Providers providing Utility Services to the Debtors, including, for the avoidance of doubt, Landlords that indirectly remit utility payments on behalf of the Debtors.

189.    The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  Cash on hand and cash generated in the ordinary course of business as well as anticipated access to cash collateral available and debtor in

possession financing will provide the Debtors with sufficient liquidity to pay the Utility Providers for Utility Services in accordance with past practice.  As additional assurance of payment, the Debtors propose to deposit $579,759 into a segregated bank account within fifteen business days after the Utilities Order is entered.

190.    The Adequate Assurance Deposit is equal to approximately two weeks of the Debtors' cost of Utility Services, calculated based on the historical average of payments made to the Utility Providers over the twelve-month period prior to the Petition Date, excluding certain amounts and subject to certain adjustments.  The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the benefit of the Utility Providers for the duration of the Debtors' chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Providers in accordance with the Adequate Assurance Procedures.

191.    The Proposed Adequate Assurance demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

192.    In addition, the Debtors propose the Adequate Assurance Procedures for any Utility Provider that is either (a) not satisfied with the Proposed Adequate Assurance or (b) seeking payment of their applicable portion of the Adequate Assurance Deposit for adequate assurance of future payment during the pendency of the chapter 11 cases.  The Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Adequate Assurance Request upon certain notice parties.  The Debtors may use their discretion to resolve any Adequate Assurance Request with the Utility Provider, without further order of the Court.  If the Debtors determine that the Adequate Assurance Request cannot be consensually resolved, the Debtors may seek Court resolution of the Adequate Assurance Request.  In addition,

if postpetition amounts remain unpaid beyond the applicable grace period associated with the Utility Services, the Utility Provider may make an Adequate Assurance Request pursuant to the proposed Adequate Assurance Procedures.  As such, I believe the proposed Adequate Assurance Procedures are an efficient and streamlined resolution process for matters related to Utility Services that may arise during the cases.

193.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Utilities Motion should be approved.

**P.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Stock and (II) Granting Related Relief (the "<u>NOL Motion</u>").**

194.    Pursuant to the NOL Motion, the Debtors seek entry of an order (a) approving certain notification and hearing procedures, substantially in the form attached to the proposed NOL Order as <u>Exhibit 1</u>, related to certain transfers of, or declarations of worthlessness with respect to, Debtor Genesis Care Pty Limited's Common Stock and Practitioner Restricted Stock; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock or Practitioner Restricted Stock in violation of the procedures entered by the Court shall be null and void *ab initio*, and (c) granting related relief.

195.    Companies generate various tax attributes through the course of their operations. For example, a company generates NOLs if the operating expenses it has incurred exceed the revenues it has earned during a single tax year.  A company may apply or "carry forward" NOLs to reduce future tax payments (subject to certain conditions).  In addition, a company may have incurred business interest expense for a single tax year that exceeds the maximum permitted

deduction.  Any business interest expense disallowed is carried forward and treated as business interest in the following tax year.  Companies can also generate a variety of other tax attributes, including foreign tax business, business tax credits, and capital loss carryforwards.

196.    The Debtors currently estimate that, as of June 30, 2022, they had approximately $522 million of U.S. federal NOLs and approximately $274.9 million of 163(j) Carryforwards. The Debtors may generate additional Tax Attributes in the 2023 and 2024 tax years, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset future U.S. federal taxable income or U.S. federal tax liability, including any taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets).

197.    I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the NOL Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: June 1, 2023

By: */s/ David Young*
Name: David Young
Title: Chief Executive Officer
Genesis Care Pty Ltd.

**<u>Exhibit A</u>**

**Corporate Organizational Structure**

Genesis Care Pty Ltd
Genesis Care Finance Pty Ltd
Genesis Specialist Care Pty Ltd
Hong Kong Non-Debtor Subsidiaries
Genesis Specialist Care UK Limited
AUS Non-Debtor Subsidiaries
AUS Operating Debtor Subsidiaries
UK Operating Debtor Subsidiary
GenesisCare USA Group Holdings Inc. (DE) (f/k/a Orion US Holdings, Inc.)
UK and Spain Non-Debtor Subsidiaries
UK Operating Debtor Subsidiaries
GenesisCare USA Holdings, Inc. (DE) (f/k/a 21st Century Oncology Holdings, Inc.)
GenesisCare USA, Inc. (FL) (f/k/a 21st Century Oncology, Inc.)
US Non-Debtor Wholly Owned Subsidiary
US Non-Debtor Partially Owned Subsidiary
US Operating Debtor Subsidiaries (various)
Legend
Senior Facilities Original Borrower
Senior Facilities 'Stark' Borrowers (acceded upon 21st Century 'Stark' acquisition, per Stark Structuring Memorandum)
Senior Facilities Guarantor
KKR and APH Loan Borrower
Intercompany Convertible Shareholder Loan Borrower
Intercompany Convertible Shareholder Loan Lender
HSBC Loan Agreement Borrower
MBL Rental Agreement Co-Lessee
MBL Rental Agreement Guarantor
MIV Swap Borrower
Stark Swap Borrower
Australia
Partially Owned GC AUS Entities
United Kingdom
Partially Owned GC UK Entities
Spain
Partially Owned GC ES Entities
United States
Partially Owned GC US Entities
Hong Kong
Proposed Filing Entities

